IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| CHOU-HSIH "MARTIN" HU | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| -V- | § | Civil No. 6:21-CV-00056 |
| | § | JURY DEMANDED |
| INTEPLAST GROUP CORPORATION | § | |
| | § | |
| Defendant. | § | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Dated*: February 21, 2023.

Respectfully submitted,

By: /s/ Dale M Rodriguez
    Dale M. Rodriguez
    *Texas Bar No. 00788302*
    *Florida Bar No. 0780081*

*Attorney in Charge for Plaintiff*

**LAW OFFICE OF DALE M. RODRIGUEZ**
450 Century Parkway, Suite 250
Allen, Texas 75013
Phone: 214-713-4665
Fax:    888-717-7542
dale@dmrlawoffice.com

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................... iii
I. Introduction ........................................................................................................................ 1
II. Statement of Disputed Material Facts .............................................................................. 1
III. Summary of the Argument .............................................................................................. 6
IV. Argument ......................................................................................................................... 6
    A. Hu's Prima Facie Case Evidence of Retaliation ......................................................... 7
        1. Hu's Protected Activity Evidence ............................................................................. 7
        2. Hu's Adverse Action Evidence ................................................................................. 9
        3. Hu's Causation Evidence ........................................................................................ 11
    B. Hu's Pretext Evidence ................................................................................................ 13
    C. Hu's "But-For" Evidence of Retaliation .................................................................... 13
V. Conclusion ...................................................................................................................... 14

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ................................................................ 6

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 747 (1998) .............................................................. 6

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) .................................................. 7, 11

*Cbocs West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ................................................................ 6

*Clark County School District v. Breeden,* 532 U.S. 268, 273 (2001) ............................................. 12

*Crawford v. Metro. Gov't of Nashville & Davidson Cty*, 555 U.S. 271, 276 (2009) ...................... 8

*Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) ............................. 6, 11, 12

*Equal Emp't Opportunity Comm'n v. Rite Way Serv., Inc.,* 819 F.3d 235, 242
   (5th Cir. 2016)* ................................................................................................................................ 8

*Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 319 (5th Cir. 1997) ............................................. 10, 11

*Fisher v. Lufkin Industries, Inc.,* 847 F.3d 752, 758-60 (5th Cir. 2017) ............................. 11, 12, 14

*Jenkins v. State of LA., Thru Dep't of Corrections*, 874 F.2d 992, 996 (5th Cir. 1989) ................ 11

*Long v. Eastfield Coll.*, 88 F.3d 300, 305–09 (5th Cir.1996) ............................................................ 9

*Parker v. State of La. Dep't of Educ. Special Sch. Dist.*, 323 Fed.Appx. 321, 329–30
   (5th Cir.2009) ................................................................................................................................... 9

*Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) ...................................... 6

*Reeves v. Sanderson Plumbing Prods, Inc*., 530 U.S. 13, 146-47 (2000) .................................. 7, 13

*Staub v. Proctor Hospital*, 562 U.S. 411, 419 (2011) ..................................................................... 11

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 n.4 (1993) ................................................... 13

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981) ............................ 6, 7

**STATUTES:**

42 U.S.C. § 1981 .......................................................................................................... 1, 6, 7, 8, 13

 Title VII of the Civil Rights Act of 1964 ................................................................... 1, 6, 7, 8, 13

**RULES:**

Fed. R. Civ. P. 56(a) ................................................................................................................ 6

# I.
# Introduction

Traditional Taiwanese-Asian cultural and racial attributes are characterized by total non-confrontation coupled with extreme deference to authority. Hu, a Taiwanese-Asian person, did not comport himself to this stereotype at Inteplast. Hu's Inteplast supervisor, James Deng ("Deng"), also a Taiwanese-Asian person, did not like that Hu refused to comport himself to this stereotype in the workplace and subjected him to various forms of national origin and/or race driven discrimination and harassment as a result. Hu complained to Inteplast's Human Resources about Deng's actions. When Deng learned of Hu's complaint and learned from Hu of his reasons for filing it, Deng embarked on a month-long retaliatory campaign against Hu with the unvarnished goal of causing Inteplast to oust Hu by forcing on Hu the false "choice" ultimatum between resigning with a severance or being terminated. Deng succeeded in causing Inteplast to retaliatorily and constructively discharge Hu in violation of 42 U.S.C. § 1981 ("§1981") and Title VII of the Civil Rights Act of 1964 ("Title VII").[1]

# II.
# Statement of Disputed Material Facts

1. Hu is of Asian race, born and raised in the Republic of China ("Taiwan" or "Taiwanese")—his national origin. (Hu Decl, ¶3).

2. Hu's primary languages are Taiwanese and Mandarin Chinese. English is a weak second language for Hu and while "fluent" he is unable to fully understand, read, write or express complex ideas or thoughts in it. (Hu Decl, ¶4).

---

[1] Hu proceeds forward solely on his retaliation claims under §1981/Title VII.

*PLAINTIFF'S RESPONSE TO DEFENDAT'S MOTION FOR SUMMARY JUDGMENT—Page 1*

3. Hu has personal working experience in Taiwan, with knowledge of traditional Taiwanese/Asian culture in the workplace, to include total non-confrontation and extreme deference to authority. (Hu Decl, ¶¶5-6).

4. Hu has personal working experience in the USA and Texas, with knowledge of USA and Texas working culture, to include frank, often challenging and open communication with and between all levels of employees and management. The two cultures, particularly in the workplace, are quite different. (Hu Decl, ¶¶7-8).

5. In Hu's experience at Inteplast, he regularly observed non-Taiwanese, non-Asian employees at Inteplast communicating, both verbally and in writing, in a direct and frank manner, with negative and critical messaging as per the norm in USA working culture without any consequence from Inteplast management. Hu also saw on a regular basis Taiwanese and Asian employees comporting with the traditional Taiwanese-Asian culture without any consequences. (Hu Decl, ¶9).

6. At Inteplast, as it was in the USA, Hu endeavored to comport himself in the workplace in a manner that other non-Taiwanese/Asian employees comported themselves: with frank, often challenging and open communication with and between all levels of employees and management. However, James Deng ("Deng"), Hu's supervisor made clear that he expected Hu, as a Taiwanese-Asian person, to strictly comport to the traditional Taiwanese-Asian stereotype—no confrontation or criticism, extreme deference to him and other supervisors and to quietly just do what he was told. Deng made this clear to Hu in the way he spoke to Hu, his attitude and the way he communicated the message to Hu to act like he was a Taiwanese-Asian person in Taiwan. Deng manifested this by harassing Hu by criticizing him, repeatedly assigning Hu menial and time-consuming job tasks and duties far outside his job description which impacted Hu's ability to fulfill

his normal job duties, giving Hu artificially lower performance appraisal ratings than what Hu's performance justified which cost Hu valuable annual pay increases tied to those ratings. Deng's negativity toward Hu worsened over time, spilling into latter 2019. (Hu Decl, ¶10).

7.     Hu had an understanding by 2019 that employers stereotyping employees based on perceptions and expectations about their national origin or race that affected terms and conditions of their employment was unlawful. Hu believed that is what Deng was doing to him and it was adversely affecting his terms and conditions of employment. (Hu Decl, ¶11).

8.     Thus, in late November 2019, Hu submitted an email complaint to Alisha Koehl, the plant Human Resources manager. Because of his weak written English, Hu's email was sparsely worded and focused on Deng's assignments, but based on Inteplast's internal complaint policy, he expected to be interviewed by Human Resources officials and he planned to then elaborate on the discriminatory reasons driving his complaint. (Hu Decl, ¶12).

9.     That never happened because Deng quickly confronted Hu about his complaint and, at that time they discussed Hu's reasons driving it. To that end, Hu communicated to Deng the message that he felt he was being targeted because he did not comport himself like he was a Taiwanese-Asian person in Taiwan as Deng expected. Deng's reaction reflected that he understood Hu's complaint to be driven by the fact that Hu dared to step out of the traditional Taiwanese/Asian stereotype and did not avoid confrontation, frank criticism or feign obiescience to him, as did other Taiwanese-Asian employees. Deng responded by asking Hu for "peace." Hu agreed to drop his complaint if Deng stopped with his discriminatory and harassing treatment. Deng agreed and, as a result, Hu informed Koehl that he was not pursing the complaint further provided Deng kept his word. (Hu Decl, ¶¶13-14).

10.     It was at this time that Deng started badgering Hu about leaving Inteplast, suggesting, falsely, that Hu had announced that he would leave to relocate elsewhere in Texas. Deng influenced Koehl and Brenda Wilson ("Wilson"), Senior Director of Human Resources into this badgering of Hu, which manifested over several meetings. Hu denied to each that he intended to leave Inteplast anytime soon, planned to remain there for at least several months and would give two weeks' notice if he decided to leave. Hu even submitted an email to Human Resources affirming same. Despite this, Deng persisted in telling customers, falsely, that Hu was leaving Inteplast. Hu denies that he told people at Inteplast earlier in 2019 that he, himself was relocating or looking for another job. It bothered Hu that Inteplast officials were suddenly pressuring him about leaving based on statements he supposedly made earlier in 2019. (Hu Decl, ¶¶15-17).

11.     Then, in late-December 2019, Deng presented Hu with a documented disciplinary counseling and assigned Hu additional job tasks that were beyond his normal job duties and with aggressive deadlines. Hu disputes the allegations that Deng made in this write-up about Hu. Hu found it odd that these accusations only now suddenly appeared right after he complained about Deng and their "peace" meeting, particularly as some of the events described were by then several months stale by Deng's own description. Nevertheless, Hu decided to, and did, timely perform the tasks Deng assigned with the plan to re-raise his complaint against Hu with Human Resources. (Hu Decl, ¶¶18-19).

12.     Unknown to Hu at this time, Deng had been waging a remarkable campaign to convince Wilson to terminate Hu's employment immediately after his "peace" meeting with Hu. Deng's email exchanges with Koehl and Wilson plainly displayed his unvarnished desire to oust Hu "ASAP." However, Wilson initially would not agree to terminate Hu because no documented progressive disciplinary action was in Hu's personnel file to support such a termination. Wilson

was reliant upon information provided by Deng as she had no personal knowledge of Hu or his circumstances or job performance. Deng responded by manufacturing the above referenced disciplinary write-up. Deng's email exchange with Wilson surrounding this reflects that Deng wanted to terminate Hu "ASAP" but that Wilson wanted documentation and that they contemplated terminating Hu sometime following the holidays because otherwise the timing would look bad. (Deng Depo, **46**:3-10, **47**:10-25, **48**:1-3,5-11,15-25, **49**:16-25, **50**:1,9-14, **53**:8-18--*Exh.9*); (Wilson Depo., **38**:12-14, **39**:5-24, **40**:6-21, **41**:3-9,20-25, **42**:1-9, **44**:1-4, **46**:1-25, **47**:1-6, **56**:18-23, **59**:12-25, **61**:21-25, **62**:1-12, **63**:14-21, **67**:11-25, **73**:9-21-- *Exhs. 3-6*).

13.     In early-January 2020, Wilson then acted. Wilson held a meeting with Hu and gave him an ultimatum: he could resign and receive a nominal severance or he would be quickly terminated. Wilson attempted to sell Hu on resigning as the wiser, preferrable "choice" because of career-negative fallout associated with involuntary termination. When Hu attempted to re-direct the discussion to renewing his Deng complaint, she would not discuss it, steering the meeting back to how Hu's Inteplast employment would end. Seeing little choice and financially being unable to survive with such a sudden and unexpected loss of income, Hu attempted to salvage something out of a bad situation by attempting to negotiate a larger severance. After a second meeting with Wilson would agree to the larger severance Hu requested. Hu understood from these Wilson meetings, that unless he resigned that his employment with Inteplast was going to be quickly terminated leaving him with no income. As a result, Hu felt that he had no reasonable alternative but to resign to at least get some severance payment, which he did. (Hu Decl, ¶¶20-23).

### III.
### Summary of the Argument

As based on Hu's facts, genuine issues of material fact exist that only a jury may resolve as to whether Inteplast subjected Hu to retaliation for opposing what he reasonably believed was unlawful national origin and/or race motivated discrimination and harassment in violation of §1981/Title VII. Inteplast's Motion for Summary Judgment ("Motion) should, thus, be denied as to Hu's retaliation claims.

### IV.
### Argument

Summary Judgment may only be granted to Inteplast if it can demonstrate that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law as to Hu's claims such that a jury could not return a verdict for Hu. *Fed. R. Civ. P*. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In weighing the Motion, the Court must view the evidence in the light most favorable to Hu, the non-movant. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 747 (1998); *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018).

"To present a prima facie case of retaliation under either Title VII or § 1981,[2] a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).[3] "If a plaintiff succeeds in making a prima facie case, the burden then shifts to the defendant to proffer a legitimate rationale for the underlying the employment action…[i]f the defendant

---

[2] As with Title VII, §1981 also prohibits retaliation and requires the same proof. *See Cbocs West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

[3] The *prima facie* case burden is not onerous. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981).

makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation." *Id*. The plaintiff's prima facie case may combine with his pretext evidence to permit the inference of unlawful discrimination and thereby defeat a summary judgment motion. *Burdine*, 450 U.S. at 255 n.10; *Reeves v. Sanderson Plumbing Prods, Inc*., 530 U.S. 13, 146-47 (2000).

In §1981/Title VII retaliation cases the overriding question is whether the employer's actions "might have `dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).[4] The legal significance of retaliatory acts "depend upon the particular circumstances...[c]ontext matters." *Id*., at 69.

A.   *Hu's Prima Facie Case Evidence of Retaliation*

Inteplast contends that Hu fails to meet the prima facie case elements. However, viewing Hu's facts in a light most favorable to him, Inteplast is wrong.

   1.   Hu's Protected Activity Evidence

Inteplast contends that Hu's email complaint to Koehl merely complained about work assignments and, thus, is not protected activity. However, Inteplast's argument misses the mark because it does not address Hu's subsequent communications to Deng, the "cats paw" (see below) retaliatory actor.

 Hu's evidence reflects that in late-November 2019, Hu submitted an email complaint to plant Human Resources manager, Koehl, complaining of Deng's treatment of him. (Hu Decl, ¶12). Deng learned of this and in early December 2019, engaged Hu in an in-person meeting to discuss

---

[4] The Court further noted "…this standard does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge'...[r]ather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id*. at 69.

Hu's complaint. (Hu Decl, ¶13). Other than Deng and Hu, there were no witnesses to this meeting and their respective versions of what was discussed at this meeting are disputed. (*Id.*). In that meeting, as per Hu, Deng and Hu discussed Hu's email complaint and the reasons driving it in greater detail than what appeared on the Koehl email. (Hu Decl, ¶13). Speaking in their mutual native language, Hu could tell from Deng's comments and responses during the discussion that he understood that the gravamen of Hu's complaint about assignments was that Deng was deliberately giving him assignments beyond his job description and undertaking harassing actions against him because he dared to step out of the traditional Taiwanese/Asian stereotype to speak his mind to co-workers and supervisors, including Deng himself. (*Id.*).

Hu personally and reasonably believed that Deng's harassment violated §1981/Title VII. . (Hu Decl, ¶¶1-11, 13). Hu submits that an objectively reasonably employee in Hu's shoes likewise would have believed that Deng's harassment violated §1981/Title VII. Indeed, it was because of that that Deng asked Hu during their meeting for "peace" and committed to assigning him tasks within his job description going forward—it otherwise made no sense for Deng to request "peace" and agree to limit job assignments at the requested of his subordinate to convince Hu to drop his complaint. (Hu Decl, ¶13).

The reasonable belief standard for protected activity recognizes there is a grey zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII. *Crawford v. Metro. Gov't of Nashville & Davidson Cty*, 555 U.S. 271, 276 (2009) ("[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity."); *See also Equal Emp't Opportunity Comm'n v. Rite Way Serv., Inc.,* 819 F.3d 235, 242 (5th Cir. 2016*).* This is recognized by Fifth Circuit cases dismissing the

underlying discrimination claims but also reversing dismissal on retaliation opposition clause grounds. *See, e.g., Long v. Eastfield Coll.*, 88 F.3d 300, 305–09 (5th Cir.1996); *Parker v. State of La. Dep't of Educ. Special Sch. Dist.*, 323 Fed.Appx. 321, 329–30 (5th Cir.2009).  Hu's evidence that he was treated differently because he refused to comport with  a national origin/racial stereotype slots within this grey zone, as viewed from a light most favorable to him.

Hu's burden here is to raise a jury question as to the reasonableness of his protected activity. Hu has met this evidentiary burden.

2. <u>Hu's Adverse Action Evidence</u>

Inteplast contends that Hu did not suffer an adverse action because he resigned. However, Hu's facts reflect that Hu was badgered about resigning, harassed by being subjected to onerous job duties and constructively discharged after voicing his above complaints to Deng. (Hu Decl, ¶¶15-23).

With respect to retaliatory harassment by being subjected to onerous job duties, the Supreme Court noted that unlawful retaliation can manifest in this form. *White*, 548 U.S. at 70-71 ("[a]lmost every job category involves some responsibilities and duties that are less desirable than others…[c]ommon sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable.").

This mirrors Hu's experience after his "peace" meeting with Deng. When Hu and Deng met, Deng asked for "peace" and agreed to cease assigning Hu duties and responsibilities outside of his job description, which had the effect of making it difficult for him to timely perform his required job duties. (Hu Decl, ¶13). However, after Deng began his retaliatory campaign immediately thereafter to convince Wilson to get rid of Hu, he presented Hu with a disciplinary

write-up documenting Hu's supposed misconduct of which Deng never previously documented. . (Hu Decl, ¶¶18-19). Deng did this in response to Wilson pointing out that there was no written disciplinary action in Hu's file to support terminate him. (Deng Depo, **46**:3-10, **47**:10-25, **48**:1-3,5-11,15-25, **49**:16-25, **50**:1,9-14, **53**:8-18--*Exh.9*) (Wilson Depo., **38**:12-14, **39**:5-24, **40**:6-21, **41**:3-9,20-25, **42**:1-9, **44**:1-4, **46**:1-25, **47**:1-6, **56**:18-23, **59**:12-25, **61**:21-25, **62**:1-12, **63**:14-21, **67**:11-25, **73**:9-21-- *Exhs. 3-6*).

As part of that same write-up, Deng broke his "peace" promise to Hu to not assign him responsibilities outside of his job description by assigning him several such responsibilities with aggressive deadlines. (Hu Decl, ¶¶18-19). In response, Hu duly complied and timely performed the assignments but also decided that he would reprise his earlier complaint against Deng with Human Resource. (*Id*.). In short, Deng retaliatorily punished Hu with these new work assignments over the holidays. (*Id*.)

With respect to discharge, Hu contends that Inteplast constructively discharged him. The requisite elements of a constructive discharge are (1) the employee subjectively felt compelled to resign; (2) an objectively reasonable similarly situated person would have felt compelled to resign; and (3) existence of aggravating factors, such as (among other things) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation. *Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 319 (5th Cir. 1997). Hu's facts reflect that Deng, Koehl and Wilson repeatedly badgered and harassed Hu in an attempt to get him to resign in December 2019. (Hu Decl, ¶¶15-17); (Deng Depo, **39**:16-25, **40**:1-7,13-20, **53**:19-23, **54**:1-10—*Exh. 10*) (Wilson Depo., **51**:2-18, **52**:5-14, **53**:12-20, **54**:13-22, **57**:6-24, **59**:2-25, **60**:1).

When Hu resisted and insisted that he had no plan to resign anytime soon, Intepast decided to—and did—confront Hu immediately after the holidays in early January 2020 and coerced him

into resigning by giving him a false "choice" ultimatum to resign with some severance monies or be terminated. (Hu Decl, ¶¶20-23). When Hu tried to raise re-raise his complaint against Deng, Wilson refused to consider it. (*Id.*). Given the circumstances, Hu reasonably understood this to be no real "choice" at all, feeling compelled to resign and salvage some severance to financially survive what was going to be a termination regardless. (*Id.*). Likewise, any objectively reasonable person in Hu's shoes would have felt compelled to resign to secure severance monies to financially survive.[5] Hu has presented sufficient evidence of a constructive discharge adverse action to support a jury finding in his favor. *Faruki*, 123 F.3d at 319; *See also Jenkins v. State of LA., Thru Dep't of Corrections*, 874 F.2d 992, 996 (5th Cir. 1989) (constructive discharge proven with evidence that employee was given ultimatum).

Hu's burden here is to raise a jury question about whether Inteplast took actions negatively affecting his job duties and/or constructively discharged him. *Davis*, 383 F.3d at 319 ("[u]ltimate employment decisions include actions affecting job duties…discharging"). Hu has met this evidentiary burden.

3. Hu's Causation Evidence

Under the "cat's paw" theory, a plaintiff may present evidence that a biased non-decisionmaker influenced the adverse action decision, thereby imputing that bias onto the employer. *Staub v. Proctor Hospital*, 562 U.S. 411, 419 (2011); *Fisher v. Lufkin Industries, Inc.*, 847 F.3d 752, 758-60 (5th Cir. 2017) (discharge unlawfully caused by retaliatory biased person). The "cat's paw" theory will allow imputation if: (1) the supervisor does an act because of a discriminatory or retaliatory bias against the plaintiff; (2) the supervisor intends that the act will

---

[5] "White did receive backpay. But White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. *Many reasonable employees* would find a month without a paycheck to be a serious hardship." *White*, 548 U.S. at 72 (emphasis added).

cause the plaintiff to suffer an adverse employment action; and (3) that act causes the ultimate employment action, even if the supervisor did not make the ultimate employment decision. *Fisher,* 847 F.3d at 758-60.

*Fisher* squares with Hu's facts here. Here, upon learning of Hu's complaint to Human Resources and confronting Hu about it, Deng immediately embarked on a campaign oust Hu. Deng made no secret of his plan to oust Hu by forcing upon him the false "choice" ultimatum of either resigning or be terminated—his email exchanges with Koehl and Wilson plainly manifest his intentions, notwithstanding his later deposition denial. (Hu Decl, ¶¶13-23); ((Deng Depo, **34**:7-11, **35**:1-20, **37**:23-25, **46**:3-10, **47**:10-25, **48**:1-3,5-11,15-25, **49**:1-8,16-25, **50**:1,9-14, **53**:8-18--*Exhs. 7, 9*) (Wilson Depo., **60**:2-23). While Wilson presented the false "choice" ultimatum to Hu, Deng was the "cat's paw" that caused it and nothing broke that causation chain. (*Id.*).

This evidence is buttressed by additional evidence of the temporal proximity between Deng discussing Hu's complaint and Deng's immediate campaign thereafter to oust him, all in a matter of under a month. *(Id.)*. Such very close temporal proximity between a complaint and the onset of adverse action activity is additional evidence supporting causation. *See Clark County School District v. Breeden,* 532 U.S. 268, 273 (2001) (very close temporal proximity sufficient to establish prima facie case).

Hu's burden here is to raise a jury question about whether Deng—the "cat's paw"—was aware of his protected activity and adversely acted on it to cause his constructive discharge. *Davis*, 383 F.3d at 320. Hu has met his evidentiary burden.

B.   *Hu's Pretext Evidence*

Inteplast contends that Hu's resignation was voluntary. However, Hu's evidence reflects, as set forth above, that he was constructively discharged—his resignation was not voluntary and Inteplast's articulation that it was is false. (Hu Decl, ¶¶13-23). Inteplast further contends that Hu supposedly engaged in misconduct prior to his employment ending. However, Wilson denies that Inteplast made a decision to terminate Hu or that his Hu's termination was inevitable—only that he would be downgraded on his annual review and placed on performance plan.[6] (Wilson Depo., **61**:21-25, **62**:1-7). Thus, this cannot be an articulated non-discriminatory reason for Hu's employment ending as it has no support in the evidentiary record and, to any extent it possibly could be, Wilson's own testimony versus Hu's evidence sufficiently raises a fact issue as to its falsity. Hu has met his evidentiary burden of raising a jury question on pretext.

C.   *Hu's "But-For" Evidence of Retaliation*

In the context of a retaliation case summary judgment under §1981/Title VII, the plaintiff's prima facie case, along with proof of pretext, is sufficient to create a jury question as to unlawful retaliation.  *Reeves*, 530 U.S. at 148 ("a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). Furthermore, once proof of pretext is presented, generally "no additional proof of discrimination is required" to defeat a summary judgment motion because "rejection of the defendant's proffered reasons is enough" to sustain a finding *both* that the reason was false and that retaliation was the real reason. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 n.4 (1993).

---

[6] Hu disputes Wilson and contends that she only gave him the false "choice" ultimatum of resign with a severance or be terminated. (Hu Decl, ¶¶20-23).

*PLAINTIFF'S RESPONSE TO DEFENDAT'S MOTION FOR SUMMARY JUDGMENT—Page  13*

Here, Hu's prima facie case, coupled with his additional, cumulative evidence of temporal proximity, and coupled with his evidence of pretext altogether taken in a light most favorable to Hu is sufficient—indeed ample—to permit a jury to find that "but for" Deng's "cat's paw" retaliatory actions, Hu's employment at Inteplast would not have been constructively discharged. *Fisher*, 847 F.3d at 758-60. Hu has met his evidentiary burden of creating a jury question on whether Intepast's retaliation was the "but-for" cause of his employment ending.

## V.
## Conclusion

For the foregoing reasons, Inteplast's summary judgment motion as to Hu's retaliation claims must be denied.

## CERTIFICATE OF WORD COUNT

      I hereby certify that this Motion complies with Section 16(c) of the Court Procedures and Dkt. 24 because it contains 4,012 words, excluding the case caption, tables of contents and authorities, certificates, and signature blocks.

                                                                                      /s/ Dale M Rodriguez  
                                                                                         Dale M. Rodriguez

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was served upon the following counsel on February 21, 2023 by ECF:

Luke C. MacDowall  
Urvashi Morolia  
LITTLER MENDELSON, P.C.  
1301 McKinney Street, Suite 1900, Houston, TX  77010  
713.951.9400 (Telephone)  
713.951.9212 (Telecopier)  
lmadowall@littler.com  
umorolia@littler.com  

**Attorney for Defendant**

                                                                                    /s/ Dale M Rodriguez  
                                                                                      Dale M. Rodriguez