United States District Court
Southern District of Texas
**ENTERED**
October 01, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| CHOU-HSIH "MARTIN" HU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:21-CV-00056 |
| | § | |
| INTEPLAST GROUP CORPORATION, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

This is an employment case. While the Parties disagree on some of the issues presented, they do agree on certain underlying facts. For instance, both Parties agree that Inteplast Group Corporation ("Inteplast") hired Chou-Hsih "Martin" Hu on March 2, 2015. They agree that Hu had a difficult relationship with many of his co-workers during his time at Inteplast. And both Parties agree that Hu's supervisors at Inteplast gave him some sort of ultimatum, which led to his resignation.

But the Parties disagree as to *why* Hu resigned from Inteplast. Inteplast alleges that Hu was a disrespectful, insubordinate, and mediocre employee who resigned after receiving a resign-or-face-disciplinary-action ultimatum. By contrast, Hu alleges that Inteplast's employees unlawfully harassed and discriminated against him for "dar[ing] to step out of the traditional Taiwanese/Asian stereotype." According to Hu, it was this discrimination by Inteplast employees that led him to resign after being given a retaliatory, resign-or-be-terminated ultimatum.

After his resignation, Hu brought a five-claim Complaint against Inteplast alleging unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866.  Inteplast has moved for summary judgment and has additionally filed a motion to strike certain evidence from the summary judgment record.

Pending before the Court are Defendant Inteplast Group Corporation's Motion for Summary Judgment, (Dkt. No. 25), and Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 28).  After reviewing the Motions, the Responses, the Replies, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** Inteplast's Motion for Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Inteplast's Motion to Strike.

## I.      BACKGROUND[1]

Inteplast is in the business of manufacturing integrated plastics, including films and wrappers often used for food and beverage packaging.  (Dkt. No. 25 at 8).  On March 2, 2015, Inteplast hired Hu as a project engineer.  (*Id.*).  He was assigned and re-assigned to projects in various cities.  (*See id.*).  For instance, Hu was assigned to expansion projects in Charlotte, North Carolina and Phoenix, Arizona from 2015 to 2017.  (*Id.*).  In 2017, Inteplast's Vice President of Engineering, James Deng, assigned Hu to various expansion projects within Inteplast's Lolita, Texas location.  (*Id.*).  In July 2018, Hu was re-assigned

---

[1]      Except where noted, this section contains only undisputed facts, which have been construed in the favor of the nonmovant.  *See Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007).

to a project in Houston, Texas until September of that same year.  (*Id.* at 9).  In November 2018, Hu was re-assigned to the Phoenix location until February 2019.  (*Id.*).  Next, Hu was assigned to a project in Remington, Indiana between January 2019 and December 2019.  (*Id.*).  The Remington project was Hu's last assignment before he resigned in January 2020.  (*Id.*).

Hu had tumultuous relationships with many of his co-workers.  (*See id.* at 9–14); (Dkt. No. 26 at 5–9).  For instance, in 2019, Hu's relationship with the Phoenix Plant Manager, Laxmikanth Gangaji, deteriorated to the point where Hu was removed from a portion of the Phoenix project.  (Dkt. No. 25 at 9–10).  More specifically, Hu told Gangaji, who was higher up in the chain of command, that Gangaji should do "[his] job," "pay attention," and "inveterate [sic] timely" in order to avoid an error in the project.  (Dkt. No. 25-2 at 92:15–22) [hereinafter "Hu Dep. I" or "Hu Dep. II"];[2] (Dkt. No. 25-18 at 2–4) (email exchange between Gangaji and Hu).  Hu then told Gangaji's boss that he should take "corrective action" against Gangaji because Gangaji did not respond to Hu's emails quickly enough.  (Hu Dep. I at 96:9–16).  As a result of this interaction, Deng removed Hu from a portion of the Phoenix project.  (*Id.* at 98:18–20).

Hu was also removed from a different project.  On November 22, 2019, Hu and his supervisor, Deng, were in the early stages of discussing a software project.  (Dkt. No. 25

---

[2]    It appears Hu was twice deposed.  In its Motion for Summary Judgment, Inteplast attached deposition excerpts from Hu's depositions dated August 8, 2022, and January 7, 2023, as a single document.  This makes citation to the depositions' internal page and line numbers inconsistent. Thus, as a matter of citation, the Court will refer to citations coming from Hu's first deposition as "Hu Dep. I" and citations coming from Hu's second deposition as "Hu Dep. II."

at 11).  Hu disagreed with Deng's approach and the discussion deteriorated to the point that he accused Deng of stealing the vendor's intellectual property.  (Hu Dep. I at 114:19–115:5).  As a result, Hu, in his own words, was "happy" to be removed from the project. (*Id.* at 115:20–23).

Hu also sent emails to some Inteplast employees complaining about his colleagues. For example, Hu forwarded an email conversation between himself and a Maintenance Management System Coordinator to Deng, questioning Deng's decision to employ that person.  (Dkt. No. 25 at 11–12).  Deng instructed Hu to "stop sending the emails like this." (Hu Dep. I at 119:25–120:9).  One day after this exchange and four days after Deng removed him from the previously mentioned software project, Hu emailed Inteplast's Regional Human Resources Manager, Alisha Koehl, to complain about Deng.  (*Id.* at 139:3–140:6).  In the email, Hu complained that Deng could not keep his commitments, assigned excess work without respect and compensation, and was late in responding to various issues. (Dkt. No. 25-26 at 2).  Koehl instructed Hu to talk with Deng about those concerns.  (Dkt. No. 25 at 12).  Hu and Deng had an in-person meeting, and the Parties have presented two separate stories as to what occurred during that meeting.  *Compare* (Dkt. No. 25 at 12) *with* (Dkt. No. 26 at 7).

After this meeting, Deng and Koehl began discussing what to do with Hu.  (Dkt. No. 25 at 12).  They discussed the possibility of suspending Hu due to his behavior.  (*Id.*). They also discussed the possibility that Hu may resign, as he had allegedly already told other employees of his intention to move to Dallas, where his family had relocated.  (*Id.* at 12–13).  During this period, Deng continued to assign Hu work with the instruction

4

that he should complete the work quickly.  (*Id.* at 14).  Hu responded that if Deng wanted the work done quickly, he should find someone else to do it.  (*Id.*).  A few days later, Hu negotiated a severance package and resigned.  (*Id.* at 14–15).

Many of these facts, such as Hu's start date, his relationship with his colleagues, and his resignation, are undisputed and come from either Hu's own testimony or email exchanges.  But the Parties disagree on the "why" behind Hu's tumultuous relationships and resignation.

Hu generally alleges that his tumultuous relationships were a product of racial or national origin discrimination because he is Taiwanese.  (Dkt. No. 26 at 5).  Citing mostly to a post-deposition declaration, Hu asserts the following:

- While Hu is "fluent" in English, he is unable to fully understand, read, write, or express complex ideas.  (*Id.*) (citing Dkt. No. 26-2 at 2).

- Hu has previously worked in Taiwan, and Taiwanese employees are non-confrontational and observe "extreme deference to authority."  (*Id.* at 6) (citing Dkt. No. 26-2 at 3).

- Hu has also previously worked in Texas, and Texan culture promotes "frank, often challenging and open communication" between co-workers. (*Id.*) (citing Dkt. No. 26-2 at 3).

- At Inteplast, Hu observed "non-Taiwanese, non-Asian employees" communicating with each other "in a direct and frank manner," including "negative and critical messaging . . . without any consequences."  (*Id.*) (citing Dkt. No. 26-2 at 3–4).

- On the other hand, at Inteplast, Hu observed that Taiwanese and Asian employees "comport[ed]" themselves "with the traditional Taiwanese-Asian culture without any consequences."  (*Id.*) (citing Dkt. No. 26-2 at 4).

- Hu communicated differently from his Taiwanese co-workers by engaging in "frank, often challenging and open communication with and between all levels of employees and management," which frustrated his supervisor, Deng, who wanted Hu to "strictly comport" himself "to the traditional

Taiwanese-Asian stereotype" of "no confrontation or criticism, extreme
deference" to supervisors, and "quietly just do[ing] what he was told." (*Id.*)
(citing Dkt. No. 26-2 at 4).

- Hu asserts that because he refused to comport himself with traditional
  Taiwanese cultural expectations, Deng "harass[ed] Hu by criticizing him"
  and "repeatedly assign[ed] Hu menial and time-consuming job tasks and
  duties far outside of his job description." (*Id.* at 6–7) (citing Dkt. No. 26-2
  at 4).

According to Hu, this harassment reached a boiling point when he submitted an
HR complaint to Koehl complaining about Deng, which then led to the private, in-person
meeting between Hu and Deng to address that complaint. (*Id.* at 7). While Inteplast
asserts that this meeting pertained to Hu's work-related assignments, (*see* Dkt. No. 25 at
12), Hu states that in this meeting, Hu informed Deng that "he felt he was being targeted
because he did not comport himself like he was a Taiwanese-Asian person in Taiwan as
Deng expected." (Dkt. No. 26 at 7). Hu alleges that after this meeting, Deng and other
high-level Inteplast employees started scheming about ways to get rid of Hu, which
included "pressuring" and "badgering" him to leave Inteplast. (*Id.* at 8). Finally, Hu
alleges that a few weeks after his meeting with Deng, Brenda Wilson, Senior Director of
Human Resources, presented Hu with an ultimatum: resign or be fired. (*Id.* at 8–9). A
day later, Hu resigned, accepted a severance package, and submitted his termination.
(Dkt. No. 25 at 15).

## II.    LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). "A material fact is one that might affect the outcome of the suit under governing

law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (internal quotation marks and citations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must then come forward with specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). The nonmovant's burden "will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of

evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). But the district court must view the evidence in the light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

## III.   DISCUSSION

Inteplast has filed both a Motion for Summary Judgment, (Dkt. No. 25), and a Motion to Strike, (Dkt. No. 28). The Court will first discuss the Motion to Strike before turning to the Motion for Summary Judgment.

### A.   MOTION TO STRIKE

Inteplast moves to strike what it contends is inadmissible evidence from the summary judgment record. (Dkt. No. 28). More specifically, Inteplast moves to strike portions of Hu's declaration that allegedly contradict his deposition testimony, (*id.* at 2–5), portions of Hu's declaration that are conclusory, (*id.* at 6–8), and portions of Hu's declaration that opine on his co-workers' states of mind, (*id.* at 8–10). Hu responds that his post-deposition declaration supplements—rather than contradicts—his deposition testimony, (Dkt. No. 29 at 1–4), is not conclusory, (*id.* at 4–7), and does not opine on his co-workers' states of mind, (*id.* at 7–8). The Court sustains the objections to the extent that Hu's declaration contains legal conclusions or speculates about the state of mind of others. The Court will only consider admissible evidence in resolving the Motions. Notwithstanding, the Court will discuss one of these issues in more detail—whether Hu's declaration contradicts his deposition testimony without explanation.

Inteplast argues that Hu's declaration, as it pertains to the November 26, 2019 meeting between Hu and Deng, should be struck insofar as it contradicts his prior deposition testimony. (Dkt. No. 28 at 4–5). In response, Hu argues that his declaration merely supplements, as opposed to contradicts, his deposition testimony and should therefore not be struck. (Dkt. No. 29 at 2–3). The Court agrees with Hu.

Under what has been called the sham-affidavit doctrine, courts will "not allow a party to defeat a motion for summary judgment [by] using an affidavit that impeaches, without explanation, sworn testimony." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)). This doctrine prevents a non-moving party from "manufactur[ing] a dispute of fact merely to defeat a motion for summary judgment." *Free v. Wal-Mart La., L.L.C.*, 815 F.App'x 765, 766 (5th Cir. 2020) (per curiam) (quoting *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000)). "However, not every discrepancy in an affidavit justifies disregarding it when evaluating summary judgment evidence." *Seigler*, 30 F.4th at 477. Indeed, "the bar for applying the doctrine is a high one, typically requiring affidavit testimony that is 'inherently inconsistent' with prior testimony." *Id.* (quoting *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) (additional citation omitted). "An affidavit that 'supplements rather than contradicts prior deposition testimony' falls outside of the doctrine's ambit." *Id.* (quoting *S.W.S. Erectors, Inc.*, 72 F.3d at 496). An explanation is required, however, where the affidavit contradicts, rather than supplements, the deposition testimony. *Id.*

In this case, Hu states in his declaration that he did not tell anyone about his plans to leave Inteplast.  (Dkt. No. 29 at 4) (referencing Dkt. No. 26-2 at 7).  But this statement somewhat contradicts statements made in Hu's deposition testimony, (Hu Dep. II at 27:25–28:2), which referenced a recorded phone call where Hu told another Inteplast employee that he was thinking about leaving Inteplast. (Dkt. No. 25-30 at 19).   In resolving Inteplast's Motion for Summary Judgment, the Court will consider Hu's declaration only to the extent it does not contradict his deposition testimony without explanation or is otherwise admissible.

With respect to Inteplast's other sham affidavit objections to the declaration, the Court finds that Hu's declaration supplements his deposition testimony.  Primarily at issue is the interplay between pages 44–48 of Hu's deposition testimony and paragraph 13 of his declaration, both of which recount Hu's November 26, 2019, conversation between Hu and Deng.  (Hu Dep. II at 44:17–48:08); (Dkt. No. 26-2 at 5–6).

In his deposition, Hu states that Deng "begged" Hu "to forgive him and make peace" between the two.  (Hu Dep. II at 45:6–8).  Hu recalls that Deng stated that he would "never [again] give [him] anything out of [his] ability to do or anything out of the plan exchange in project."  (*Id.* at 45:13–14).  Deng followed this by adding that "he d[idn't] want [Hu] to make any complaint or request to HR about him, and anything [Hu] wanted to complain [about] need[ed] to go through him because he is the manager."  (*Id.* at 45:16–19).  The potential conflict between Hu's deposition and declaration arises from when Inteplast's counsel twice asked Hu if there was anything else about the conversation that

Hu could remember to which Hu responded: "No. Of course, there's other small details, but mainly that was it" and that he "can't recall now." (*Id.* at 46:13–16, 48:7–8).

The Court finds that Hu's declaration simply adds details to this conversation. In his declaration, Hu adds that, during their November meeting, Hu "did communicate to Deng the message that [he] felt like [Deng] was targeting [him] because [he] was not comporting [himself] like [he] was a Taiwanese-Asian person in Taiwan, the way that other Taiwanese-Asian employees at Inteplast did to Deng's expectations." (Dkt. No. 26-2 at 5–6). Hu then states that he believed Deng's delegation of tough assignments to Hu was the result of racial or national origin harassment:

> From the way Deng spoke in our mutual native language and his mannerisms, I could tell from his comments and responses during the discussion that he understood that the basis of my complaint about his assignments was that he was deliberately giving me assignments beyond my job description and undertaking harassing actions against me because I dared to step out of the traditional Taiwanese/Asian stereotype and did not avoid confrontation, frank criticism or feign obiescience [sic] to him, as did other Taiwanese-Asian employees.

(*Id.* at 6).

Hu's declaration is not inherently inconsistent with his prior testimony. Hu answered Inteplast's questions regarding his November 26, 2019 conversation with Deng. (Hu Dep II at 44:17–48:08). Hu gave a thorough response, including an alleged apology from Deng to Hu during this conversation and Deng's promise that he would assign Hu future tasks falling more in line with Hu's job description. (*Id.* at 45:6–8). While Hu's deposition testimony did not expressly include the fact that Hu told Deng that he felt like

11

he was being racially discriminated against, he was not asked that question. To be sure, Hu's declaration would be inherently inconsistent with his prior deposition testimony if, at his deposition, he had been asked whether he informed Deng that he was being discriminated against on the basis of his race or national origin and Hu had responded "no" to that question. An affidavit is not a sham if an attorney asks a deponent if that is everything that happened, the deponent answers that they believe it is, yet the deponent later remembers additional details. Attorneys often ask broad questions because they are leery of asking a direct question that might prompt the witness. But depositions should not be used as traps for witnesses. *See Campbell v. Eastland*, 307 F.2d 478, 489–90, 616 (5th Cir. 1977) ("The rationale for discovery is to escape from the sporting theory of litigation towards the principle of an open proceeding in which surprise is minimized and the opposing legal and factual positions are fully clarified for the enlightenment of the decision-maker."). Instead, they are an opportunity for the parties to discover as much information as that witness has.

The Court finds that the additional information provided by Hu with respect to his November 26, 2019 conversation with Deng is not inherently inconsistent with his deposition testimony. Therefore, the Court will consider paragraph 13 of Hu's declaration, (Dkt. No. 26-2 at 5–6).

B.     MOTION FOR SUMMARY JUDGMENT

Now, onto the Motion for Summary Judgment. Hu originally brought five claims against Inteplast:

1.     A national origin/race discrimination claim under Title VII (Count I), (Dkt. No. 1 at 5), which also includes what the Court construes as a hostile work environment claim due to national origin/race under Title VII, (*id.* at 5);

2.     A race discrimination claim under 42 U.S.C. § 1981 (Count II), (*id.* at 6);

3.     A retaliation claim under Title VII (Count III), (*id.* at 6–7); and

4.     A retaliation claim under Section 1981 (Count IV), (*id.* at 7–8).

Inteplast has moved for summary judgment on all of Hu's claims.  (*See* Dkt. No. 25).  Hu filed a response in which he abandoned all but the two retaliation claims in Counts III and IV.  (*See* Dkt. No. 26 at 5 n.1) ("Hu proceeds forward solely on his retaliation claims under §1981/Title VII.").  Accordingly, the Court dismisses Counts I and II and addresses the remaining claims in turn.

The Parties dispute whether Inteplast violated Title VII and Section 1981 by unlawfully retaliating against Hu.  (Dkt. No. 25 at 22–26); (Dkt. No. 26 at 11–18).  The Court notes that "'[r]etaliation claims under § 1981 and Title VII . . . are parallel causes of action,' which means they 'require[ ] proof of the same elements in order to establish liability.'"  *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) (quoting *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 340 n.8 (5th Cir. 2003))

Because Hu relies on circumstantial evidence, as opposed to direct evidence, the Court applies the *McDonnell Douglas* burden-shifting paradigm.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).  This

framework first requires a plaintiff to establish a prima facie case of retaliation. *Arredondo v. Elwood Staffing Servs., Inc.,* ____ F.4th ____, 2023 WL 5490254, at *6 (5th Cir. Aug. 25, 2023). If the plaintiff is successful, the defendant must provide a "legitimate non-retaliatory reason" for the employment action. *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013). If the defendant does, the burden falls to the employee to show that the employer's stated reason is a pretext for unlawful retaliation. *Gorman v. Verizon Wireless Tex., L.L.C.,* 753 F.3d 165, 171 (5th Cir. 2014). "Under this framework, the employee's ultimate burden is to prove that the adverse employment action would not have occurred but for the protected conduct." *Wantou v. Wal-Mart Stores Tex., L.L.C.,* 23 F.4th 422, 437 (5th Cir. 2022).

### 1.      Prima Facie Case of Retaliation

The Parties dispute whether Hu has established a prima facie retaliation claim. (Dkt. No. 25 at 22–26); (Dkt. No. 26 at 11–18). "To establish a prima facie case of retaliation, a plaintiff must 'demonstrate that: (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action.'" *Lindsley v. TRT Holdings, Inc.,* 984 F.3d 460, 469 (5th Cir. 2021) (quoting *Gorman,* 753 F.3d at 170).

### a.      Protected Activity

The Parties dispute whether Hu engaged in a protected activity before Inteplast fired him. (Dkt. No. 25 at 22–23); (Dkt. No. 26 at 11–13). Inteplast argues that Hu did not engage in a protected activity because he merely complained about his work assignments instead of clearly complaining that he was being discriminated against. (Dkt. No. 25

at 22–23).   In response, Hu argues that he engaged in protected activity by communicating his belief that Deng was "deliberately . . . undertaking harassing actions against him because he dared to step out of the traditional Taiwanese/Asian stereotype to speak his mind to co-workers and supervisors, including Deng himself."  (Dkt. No. 26 at 12).  The Court agrees with Hu.

To establish the first element of his prima facie retaliation case, Hu must show that he "engaged in activity protected by Title VII" before Inteplast fired him.  *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quoting *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).  "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."  *Id.* (quotation omitted).  "To satisfy this opposition requirement, [a plaintiff] need only show that []he had a 'reasonable belief that the employer was engaged in unlawful employment practices.'"  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (quoting *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000)).  While "[m]agic words are not required" for a plaintiff to meet this showing, a plaintiff "must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue."  *Brown v. United Parcel Serv., Inc.*, 406 F.App'x 837, 840 (5th Cir. 2010).

*Turner* is an example where the plaintiff did not sufficiently "alert" an employer that she was complaining about an unlawful employment practice.  In *Turner*, the plaintiff notified the company's human resources department about her frustration with her supervisor.  476 F.3d at 342–3.  In her complaint to HR, the employee "did not mention

race," but rather, complained generally about her supervisor's "treatment of her during a dispute over a project[.]" *Id.* Five days later, she was fired. *Id.* The Fifth Circuit, in affirming the dismissal of the plaintiff's Title VII retaliation claim, held that the employee's email to HR did "not support a prima facie showing of retaliation" because her "email focuse[d] on" a specific work-related project "and the deteriorating working relationship" between the employee and her supervisor. *Id.* at 349. More specifically, the email "contain[ed] no reference to conduct that could even plausibly be considered discriminatory in nature." *Id.*

In this case, on November 26, 2019, Hu emailed Inteplast's HR department to complain about his supervisor, Deng. (Hu Dep. I at 139:3–18, 139:23–140:6).

Hu:    Hi Alisha,

I would like to file a complain regarding my supervisor James' late or no reponse regarding the assignment issues raised up to him, and the ambiguous assigned work in his emial today. Would you please let me if it's eligible? If yes, please let me know how I can proceed. Thank you.

Alisha:  Martin,

I do not understand your complaint. I am in the office today if you would like to discuss.

Hu:    Hi Alisha,

It's about James can't keep his commitments, assign excess works without respcts and compensation, and late response to serveral issues I raised up either verbally or in writing. I just spoke with him this afternoon and made a decision to limit my works solely regarding the expansion project. If the same issues of later response and failed to keep promise arise again, I will then schedule a meeting with you and James.

> Thanks for your attention to this matter. Happy Thanksgiving!

(Dkt. No. 25-26 at 2–3) (typographical errors in original).

Hu's email focused on his workplace assignments and the deteriorating working relationship between Hu and his supervisor, Deng.  By itself, this email exchange did nothing to alert Inteplast of potentially discriminatory behavior, and therefore does not show that Hu engaged in a protected activity before being fired.  While "[m]agic words are not required" for a plaintiff to meet this showing, a plaintiff "must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. United Parcel Serv., Inc.*, 406 F.App'x 837, 840 (5th Cir. 2010).

However, Hu testified that he anticipated meeting with HR to explain the discrimination he was experiencing in more detail.  (Dkt. No. 26-2 at 5–6).  Before that meeting could happen, however, Deng asked to speak with Hu in private.  (*Id*.).  So, a few days after Hu emailed his complaint to HR, he and Deng met privately to discuss his complaint.  (*Id*.); (Hu Dep. II at 45:2–4).  Hu told Deng that he believed Deng was targeting him because Hu was not acting like a Taiwanese-Asian employee in Taiwan would.  (Dkt. No. 26-2 at 5–6).  Hu informed Deng that he "definitely intended to pursue this matter with Human Resources[.]"  (*Id*. at 6).  Hu claims that in response, Deng "begged" him "to forgive him and make peace" between the two.  (Hu Dep. II at 45:6–8).  Deng allegedly told Hu that "he d[idn't] want [Hu] to make any complaint or request to HR about [Deng], and anything [Hu] wanted to complain [about] need[ed] to go through him because he is the manager."  (*Id*. at 45:16–19).  Read in a light most favorable to him, Hu

17

has provided sufficient evidence to establish a genuine issue of material fact with respect to the first element of a prima facie case—that he engaged in protected activity.

### b.   Adverse Employment Action

The Parties next dispute the second element of Hu's prima facie Title VII case, *i.e.*, whether Hu suffered an adverse employment action.  (Dkt. No. 25 at 17–19); (Dkt. No. 26 at 13–15).  Inteplast argues that Hu did not suffer an adverse employment action because Hu voluntarily resigned.  (Dkt. No. 25 at 17–19).  In response, Hu argues that Inteplast presented Hu with a resign-or-be-fired ultimatum, which constitutes an adverse employment action under the "constructive discharge" doctrine.  (Dkt. No. 26 at 13–15).  The Court agrees with Hu.

Adverse employment actions include those that result in "hiring, firing, compensation," or that affect the "'terms, conditions, or privileges' of his or her employment."  *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 497 (5th Cir. 2023) (en banc) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Prior to *Hamilton*, the Fifth Circuit limited the scope of adverse employment actions to "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."  *Id.* at 498 (quoting *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d at 824 (internal quotation marks omitted)).  But in *Hamilton,* the Fifth Circuit rejected its "ultimate-employment-decision test" in favor of a less restrictive standard.  *See id*. at 501.  The Court finds that the adverse employment actions alleged by Hu in this case meet that less restrictive standard.  (Dkt. No. 26–2 at 6–11).

Even so, the Court finds that there is a fact issue as to whether Hu's allegedly forced resignation is an adverse employment action in this case.  "A resignation is

actionable under Title VII" when the plaintiff has been "constructive[ly] discharge[d]." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). A "plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired." *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338–39 (5th Cir. 2014). But "in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable." *Id.* at 339.

In this case, Hu testified that he was given a 24-hour resign-or-be-terminated ultimatum.

> Q.   Ms. Wilson gave you some options during that conversation; is that right?
>
> A.   Yes.
>
> Q.   One of those options was to resign your employment; is that accurate?
>
> A.   Yes.
>
> Q.   The other option was that if you did not resign your employment, you would be issued a disciplinary action for poor performance; is that right?
>
> A.   Incorrect.
>
> Q.   Okay. What other option did she provide you?
>
> A.   Well, I only know the word she used was "terminate."
>
> Q.   What words do you remember Ms. Wilson saying to you exactly?
>
> A.   She said she – she was telling me within 24 hours and I'll be terminate.
>
> . . .
>
> Q.   Anything else you all discussed?

A.    Yes. I also talked to her more regarding about termination. I did ask her the difference between termination and layoff. And I asked her to explain it to me why not just layoff instead of termination. Because the money that you receive, the severance pay is different.

Q.    Why do you think that –

A.    Yes. I also asked her before I left, and I asked her to present me the evidence that shows that I didn't do a good job. And instead she gave me a document and have nothing to do with me and showed nothing regarding about me. Well, I also wanted to talk to her again the next day. And she was telling me 10:00 o'clock next day she doesn't have time to have a meeting with me. And basically she refused to give me another opportunity. Instead only two choices, either resign myself or just terminated by them. And she was asking me the next day to tell her.

(*Id.* at 76:19–77:10, 79:15–80:10).   Inteplast disputes that Hu was given this ultimatum. (Dkt. No. 25 at 18).   Instead, Inteplast alleges that "Hu was merely given an opportunity to resign before being issued a disciplinary action."   (*Id.*).   It is for a jury to decide which version is more credible.[3]   Therefore, Hu has provided sufficient evidence to establish a genuine issue of material fact with respect to the second element of a prima facie case—that he suffered an adverse employment action.

---

[3]    *See Wooten v. Federal Express,* 325 F.App'x 297, 303 (5th Cir. 2009) ("The difficulty of evaluating discrimination claims at the summary judgment stage is well known and derives from obvious sources, namely the importance of 'he said/she said' credibility determinations.   We remain keenly aware that '[w]hether ... allegations are too vague to ultimately carry the day is a credibility determination, or requires weighing the evidence, both of which are more appropriately done by the trier of fact.'" (quoting *Harvill v. Westward Commc'ns,* 433 F.3d 428, 436 (5th Cir. 2005)).

c.    Element Three: Causal Connection

The Parties also contest the third and final element of Hu's prima facie retaliation claim, i.e., whether a causal connection existed between Hu's protected activity and his adverse employment action.  (Dkt. No. 25 at 23–24); (Dkt. No. 26 at 15–16).  Hu argues that his November 2019 meeting with Deng, during which Hu allegedly complained to Deng about being discriminatorily given unfair work assignments, led to Deng's "campaign" to "oust Hu" from Inteplast.  (Dkt. No. 26 at 16).  And, Hu argues, the one-month span in time between Hu and Deng's November meeting and Inteplast's eventual resign-or-be-terminated ultimatum constitutes sufficient evidence of causation.  (*Id.*).  By contrast, Inteplast argues that Hu cannot make out a prima facie case of causation because Deng was considering disciplinary action before their meeting, Hu had engaged in insubordinate and disrespectful behavior before their meeting, and Hu had been removed from two separate projects before their meeting.  (Dkt. No. 25 at 23–24).

For Hu to prove a prima facie case of retaliation, he must prove that there is a causal connection between his complaint and the adverse employment action.  *See Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019).  "At the prima facie [stage], a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action."  *Id.* at 243.  But "[t]he protected act and the adverse employment action must be very close in time to establish causation by timing alone."  *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015) (cleaned up).

Here, the temporal proximity between Hu and Deng's meeting and the adverse employment actions suffices to establish a causal connection at the prima facie stage. Hu and Deng's meeting appears to have occurred on November 26, 2019, and Hu resigned on January 7, 2020. (Dkt. No. 25 at 12, 14). This six-week timespan "fits comfortably within" the Fifth Circuit's "time periods . . . to establish causation." *Garcia*, 938 F.3d at 243; *see also Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (holding that a span of two months is close enough to establish a causal connection at the prima facie stage); *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001) (observing that four months is sufficient under circuit precedent); *contra Vargas v. McHugh*, 630 F.App'x 213, 217 (5th Cir. 2015) (per curiam) (holding that fifteen months, standing alone, is too long) (cited favorably in *Garcia*, 938 F.3d at 242). Therefore, Hu has provided sufficient evidence to establish a genuine issue of material fact with respect to the third element of a prima facie case—a causal connection.

### 2.  Legitimate Reason

Once a prima facie case of discrimination has been established, "the burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021). "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007), *abrogated by Hamilton*, 2023 WL 5316716 (5th Cir. Aug. 18, 2023). In this case, Inteplast alleges that Hu was disrespectful and insubordinate to his supervisors and colleagues. (Dkt. No. 25 at

19–20).   Because these are legitimate nonretaliatory business reasons for taking an adverse employment action against Hu, Inteplast has met its burden.

### 3. Pretext

The burden now shifts back to Hu to show that Inteplast's stated reason is a pretext for unlawful retaliation.  *Gorman*, 753 F.3d at 171.  The Parties dispute whether Inteplast's legitimate reason was pretextual.  (Dkt. No. 25 at 19–20); (Dkt. No. 26 at 17); (Dkt. No. 27 at 6–7).  Inteplast argues that the six-week span between Hu and Deng's November 2019 meeting and his January 2020 resignation is not enough evidence to prove pretext.  (Dkt. No. 25 at 25).  In response, Hu argues that Hu's "resignation was not voluntary and Inteplast's articulation that it was is false."  (Dkt. No 26 at 17).  In addition, Hu argues that Inteplast has failed to articulate a non-discriminatory reason for Hu's discharge because Inteplast did not provide any "support in the evidentiary record" showing that Hu was fired for a "non-discriminatory reason."  (*Id.*).  In reply, Inteplast asserts that Hu has not carried his burden because he devotes only "a single paragraph" to the issue of pretext.  (Dkt. No. 27 at 6).

"Pretext may be established through evidence of disparate treatment or by showing the employer's explanation to be false or unworthy of credence—that it is not the real reason for the adverse employment action."  *Jones*, 8 F.4th at 368 (internal quotation marks omitted).  But "the plaintiff must produce 'substantial evidence' of pretext."  *Id.* at 369 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).  "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."

*Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003). "Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). In answering this question, a court should consider "the probative value of the proof that the employer's explanation is false and any evidence that supports the employer's case." *Jones*, 8 F.4th at 369 (cleaned up).

Hu testified that after his complaint to HR and his meeting with Deng in which he accused Deng of targeting Hu because he was not comporting himself like he "was a Taiwanese-Asian person in Taiwan," Deng retaliated against him. (Dkt. No. 26-2 at 5–6). The meeting occurred in late November 2019, after which Deng began "badgering" Hu about when he was going to leave Inteplast. (*Id.* at 6–7). Hu testified that he "had no plans to leave" and "was perplexed by him pestering" him about it. (*Id.*). HR Manager Koehl later asked Hu about leaving as well, despite that Hu had never informed her that he was leaving. (*Id.* at 7).

Also in December 2019, Deng emailed Hu a disciplinary writeup and assigned "additional, specific job tasks that were beyond [his] normal job duties." (*Id.* at 8). Shortly thereafter in early January 2020, Senior Director of HR Brenda Wilson presented Hu with the alleged resign-or-be-fired ultimatum. (*Id.* at 9). When Hu tried to discuss the issues he was having with Deng, Wilson declined and instead "steer[ed]" the conversation "back to how [his] Inteplast employment was going to end." (*Id.*). Hu testified that the next day, he informed Wilson that he "was being subjected to discrimination and

24

retaliated against, but Wilson did not want to discuss it." (*Id.* at 10–11).  All of the foregoing allegedly occurred less than two months after Hu's complaint to HR and meeting with Deng.

With respect to pretext arguments based on temporal proximity, the Fifth Circuit has explained that:

> Temporal proximity gets [a plaintiff] through his prima facie case but does not, on its own, establish that the company's stated explanation for [the plaintiff's] firing was mere pretext. At the pretext stage, the Supreme Court's decision in *Nassar* requires a showing of but-for causation, which requires more than mere temporal proximity.

*Garcia*, 938 F.3d at 243–44 (cleaned up).  In this case, Hu alleges that he informed Deng that he believed Deng was discriminating against him because of his national origin and race in late November 2019.  (*See* Dkt. No. 26-2 at 5–6).  This exchange occurred just after Hu complained to HR about Deng.  (*Id.*).  Deng allegedly begged Hu to not go back to HR, and any further complaints about Deng had to be made to Deng himself since he was Hu's supervisor.  (Hu Dep. II at 45:6–19).  Hu testified that he thought he and Deng had "made peace."  (*Id.* at 47:8–12).  Shortly thereafter in December 2019, Hu received a disciplinary writeup that covered multiple performance problems, many of which occurred months before the November 2019 meeting.  (Dkt. No. 26-2 at 8).  Also in December 2019, when Deng talked to Hu about resigning from Inteplast, Hu assured Deng that he was not.  (Dkt. No. 26 at 6–8).  Nonetheless, Deng informed HR that Hu would be resigning, and HR, in turn, questioned Hu about whether or not he would be resigning.  (*Id.*).  HR presented Hu with a resign-or-be-fired ultimatum with a severance

and waiver of rights to sue approximately six weeks after Hu's meeting with Deng. (*Id.* at 9–11).

Construing the evidence in favor of the non-movant, the Court finds that Hu has established a genuine issue of material fact with respect to whether the legitimate nonretaliatory reasons for the adverse employment actions against him were a pretext for unlawful retaliation.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Inteplast Group Corporation's Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 28).

Further, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Inteplast Group Corporation's Motion for Summary Judgment, (Dkt. No. 25). The Court **DISMISSES WITH PREJUDICE** the claims contained in Counts I and II. Plaintiff's retaliation claims in Counts III and IV remain for resolution before a finder of fact.

Signed on September 29, 2023.

_Drew B. Tipton_

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**